# EXHIBIT A - 3

**IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA**

THE BOTHWELL LAW GROUP, P.C.      )
and MIKE BOTHWELL,                )
                                  )
    Plaintiffs,                  )
                                  )        Civil Action File No.
v.                                )
                                  )        _____
JULIE BRACKER, JASON MARCUS,      )
BRACKER & MARCUS LLC, and         )
SHERI LANG,                       )
    Defendants.                  )
_____)

## COMPLAINT

**COME NOW,** Plaintiffs **The Bothwell Law Group, P.C.** and **Mike Bothwell**, and make their complaint against Defendants **Julie Bracker**, **Jason Marcus**, **Bracker & Marcus LLC**, and **Sheri Lang**.

## INTRODUCTION

This case is a textbook example of how not to leave a law firm. As set forth below, Defendants Julie Bracker and Jason Marcus used deception and high-pressure tactics to steal nearly all of the clients of Plaintiff The Bothwell Law Group, P.C., (previously known as Bothwell Bracker, P.C.) while they were still employed by the firm. Defendants conspired to delay significant events in cases and diverted and delayed filing new cases until they were in a position to take those cases for themselves. They induced Plaintiffs to pay them over $695,000 in bonuses by false representations and material concealments. They quickly converted the bonuses to certified funds and immediately began surreptitiously contacting all of Plaintiffs' clients. Through misinformation and disparagement they convinced those clients to cut ties with Plaintiffs and engage their new firm – **while they were still employed by Plaintiffs' firm.**

Shortly before – and even after – they resigned, Defendants stole and deleted valuable data, client files, and firm documents and forms and appropriated them for their own use. After their departure, Defendants continued to defame Plaintiffs and to deceive clients in an attempt to deprive Plaintiffs of contingency fee awards arising from work performed by Plaintiffs. Plaintiffs bring this action to require Defendants to account for and disgorge any and all proceeds flowing from their wrongdoing, as well as for damages.

### Parties, Jurisdiction, and Venue

1.

Plaintiff Mike Bothwell ("Bothwell") is an individual residing in Fulton County, Georgia.

2.

Plaintiff The Bothwell Law Group, P.C. ("BLG") is a Georgia professional corporation with its principal place of business in Roswell, Fulton County, Georgia.[1] BLG was formerly known as Bothwell Bracker, P.C.

3.

Defendant Julie Bracker ("Bracker") is an individual residing at 3383 Saxony Glen, Marietta, Cobb County, Georgia.  Service of process may be made upon Bracker at her residence or her place of employment.

4.

Defendant Jason Marcus ("Marcus") is an individual residing at 1715 Liberty Lane, Roswell, Fulton County, Georgia.  Service of process may be made upon Marcus at his residence or at his place of employment.

---

[1] For readability's sake, BLG will sometimes be referred to as "the Firm."

5.

Defendant Bracker & Marcus LLC ("BM") is a Georgia limited liability company with its registered office and principal place of business at 3225 Shallowford Road, Suite 1120, Marietta, Cobb County, Georgia.   Service of process may be made upon BM through its registered agent, Julie Bracker, at that address.

6.

Defendant Sheri Lang ("Lang") is an individual residing at 1713 Ellenwood Drive, Roswell, Fulton County, Georgia.  Lang, another former employee of the Firm, is now employed by Bracker & Marcus, LLC.  Service of process may be made upon Lang at her residence or her place of employment.

7.

Jurisdiction and venue are proper in Fulton County, Georgia, because one or more Defendants reside in the County.

**Factual Background**

8.

Mike Bothwell is a Georgia-licensed attorney who has been practicing law for 24 years.

9.

In 1996, Bothwell founded the Firm now known as The Bothwell Law Group, P.C. ("BLG"), then named "Mike Bothwell, P.C."  Bothwell has always been the sole shareholder and owner of the Firm.

10.

On May 30, 2006, the Firm hired Julie Bracker as an associate attorney.

3

11.

On August 19, 2008, the Firm hired Jason Marcus as an associate attorney.

12.

In or about 2011, Bothwell agreed to designate Bracker as non-equity partner, but Bracker has never been a shareholder of the firm.  Instead, Bracker was referred to as a Partner for marketing purposes, and because Bracker wanted the added prestige of such a title.

13.

In 2011, Bothwell changed the name of the Firm to Bothwell Bracker, P.C.   No ownership interests were created or altered as part of the name change.

14.

Bracker retained the status and title of non-equity partner for the remainder of her tenure with the Firm.

15.

At all times, the Firm's primary compensation mechanism for all non-shareholder employees and non-equity partners, including Bracker and Marcus, was a fixed salary and occasional bonuses at Mr. Bothwell's sole discretion.

16.

At the end of the summer of 2014, Bracker and Marcus began taking frequent walks together around the office park complex and having closed door meetings in their offices.

17.

As early as October 2014, Bracker and Marcus began looking for office space for their new firm.  In order to avoid suspicion, they told Firm employees that Marcus was looking to invest in office space and Bracker was helping him invest (this, despite Marcus and Bracker

repeatedly claiming financial difficulties).

18.

Bracker and Marcus were discussing the content of their new firm's website (and their new firm's domain name) as early as October 2014.

19.

The website's domain was created on January 1, 2015 while Bracker and Marcus were still employed by the Firm

20.

As is detailed below, Bracker and Marcus began diverting new cases while they were still employed by the Firm and otherwise slow rolling cases to the detriment of the Firm and, concurrently, to the future benefit of BM.

21.

In October of 2014, despite being in the office during regular hours, Bracker billed only 98 hours and Marcus billed only 92 hours for the Firm.

22.

In November of 2014, despite being in the office during regular hours, Bracker billed only 74 hours for the Firm.  Marcus was frequently out of the office, having taken a "floating vacation," and billed only 39 hours for the Firm.

23.

In December of 2014, despite both being in the office during regular hours, Bracker billed only 62 hours and Marcus billed only 63 hours for the Firm.

24.

Although they were billing relatively minor amounts of time to the Firm for the last three

months of the year, Bracker and Marcus were intentionally pushing client activities and delaying signing up potential clients into January 2015 under the guise that they were "swamped." Many of those existing and potential clients ultimately became clients of Bracker Marcus.

**Bonuses at the End of 2014**

25.

In the summer of 2014, Bothwell began negotiating a settlement of a federal False Claims Act case that Bothwell had been litigating for almost 16 years.

26.

Prior to the settlement, Bracker told Bothwell and Firm employee DeAnn Birchfield that, given Bothwell's personal financial investment in the case and years working on it, she did not expect to get bonus money from it because it was "his case" and the firm needed to clear the books and pay off debt incurred over 16 years of work.  Bracker stated that she did not expect a bonus until other cases brought in additional settlement monies.

27.

However, as soon as the case settled in principle, Bracker began a campaign of pressure on Bothwell to have pity on her and provide her cash from the settlement to get her out of an alleged personal "financial crisis."

28.

Bracker told Bothwell that she was about to lose her home and the Internal Revenue Services was pursuing her for failing to pay taxes on the $50,000 Bothwell had given her the previous year so that she could buy her new home. Repeatedly and often, Bracker mentioned losing her home for failure to pay property taxes and the possibility of jail for failing to pay federal taxes.

29.

During the same time period, Bothwell began discussing the possibility of creating a new entity in which Bracker and Marcus would each have an ownership (equity) interest.

30.

The partnership deal would require capital contributions from each of them.

31.

Bothwell planned to give Bracker and Marcus large discretionary bonuses contingent on their entering into written agreements, which would obligate them to the Firm and/or a new partnership entity.

32.

 Whenever Bothwell brought up to Bracker and Marcus that they needed to sign a partnership agreements and/or related documents before he would pay the bonuses, Bracker would immediately say that she was facing a personal financial crisis and had too much going on personally to discuss and finalize an equity partnership agreement or sign any documents (which they knew would obligate them to the Firm and/or a future partnership entity) before receiving the money.

33.

Bracker falsely represented to Bothwell in December 2014 that she would sign a partnership agreement and related documents after the New Year, but begged Bothwell to give her a bonus immediately in order to address her personal financial emergencies.

34.

Marcus also indicated that he had substantial personal expenses that would eat up his expected bonus and indicated he wanted to negotiate a partnership agreement after the first of the

year.

35.

Both Bracker and Marcus spoke with Bothwell about negotiating an equity partnership and discussed the need to invest in new computers, phones, and other upgrades to the Firm's infrastructure. Both agreed to meet with a management consultant to help with the transition to partnership and both received and reviewed the consultant's initial package of information to start the process. The Firm fronted the costs for Bracker to initiate the online portion of the consulting process.

36.

Because of Bracker's representations that she was in dire financial distress and Marcus' claims that he needed funds immediately for personal expenses, Bothwell agreed to provide bonuses to Bracker & Marcus in advance.

37.

At the end of 2014, he gave Bracker almost $400,000.00, the single largest bonus she had ever received by a substantial margin, and over four times greater than her base salary.

38.

Bothwell gave Marcus approximately $250,000.00, the single largest bonus he had ever received, and nearly four times greater than his base salary.

39.

Having been persuaded to advance bonuses to Bracker and Marcus, Bothwell met with Lang, one of the Firm paralegals, and offered her a bonus. Bothwell told her that it had never been the Firm's policy to give bonuses to new employees, but that he was making an exception for her making a long-term commitment to the Firm.

40.

Lang accepted the bonus of approximately $45,000.00 (about one-year's salary) without revealing that she had already made plans to leave with Bracker and Marcus.

41.

On or about December 30, 2014, both Bracker and Marcus requested that they receive their bonuses in certified funds.  Though they had received discretionary bonuses in previous years, Bracker and Marcus had never before requested payment of those bonuses in certified funds.

42.

Despite the inherent difficulties of accommodating such a request during the holiday season, the Firm and bank staff members worked to enable Bracker and Marcus to receive certified funds that same day.

43.

Bracker and Marcus then immediately began contacting Firm clients and asking them to move their cases to Bracker & Marcus, LLC, their new firm.  Every major Firm client was contacted New Year's Eve day or New Year's Day when Bracker and Marcus knew no one else at the Firm would be in the office.

44.

Following a short break for New Year's, Bothwell returned to the Firm office on Monday, January 5, 2015 for a Firm planning meeting that he had set up in person with Bracker on January 3, 2015.  Bracker texted him before the meeting and claimed she had forgotten that her children were out of school and she could not attend.

45.

On his desk, Bothwell found resignation letters from Bracker and Marcus dated Sunday, January 4, 2015.  Bothwell found Bracker's office stripped bare and Marcus' office in disarray.

46.

After using Firm computers to type their resignation letters, Bracker and Marcus left their letters on Bothwell's desk the day before his return, knowing that he does not work on Sundays in accordance with his personal religious beliefs.

47.

After reading the letters, Bothwell excused Lang and his staff for the day.  Lang claimed to have had no idea that Bracker and Marcus were departing.

48.

Lang's claim was false.

49.

Prior to being excused from work on January 5, 2015, Lang had begun deleting files from her computer and the Firm's server, including all of her instant messages with Bracker.

50.

Later that day, Lang falsely claimed to the Firm that she had just been offered a job with Bracker and Marcus' newly formed law firm, Bracker & Marcus LLC, and was likely to accept the offer.

51.

Lang met with Bothwell the next morning, at which time she again falsely claimed that she did not know Bracker and Marcus were departing to set up their competing firm until after the fact.  Lang formally quit and is currently in BM's employ.

**Bracker and Marcus Take Clients While Still Employed by the Firm**

52.

In her resignation letter, a true and accurate copy of which is attached hereto as **Exhibit A**, Bracker listed a number of clients that she claimed – prior to her resignation – had already agreed to be represented by her "new firm" and other clients she claimed were in the process of confirming in writing their agreement to change firms..

53.

Additionally, Bracker attached several form election letters from certain clients dated between December 31, 2014 and January 3, 2015, and stated that she would "be in touch to arrange transfer of the client files, where appropriate."

54.

Marcus' resignation letter (beginning with "Mike:  I quit, effective immediately."), a true and accurate copy of which is attached hereto as **Exhibit B**, also included a form election letter and form file transfer letter – both dated January 1, 2015 – from another client who had supposedly chosen to have her case handled by Bracker and Marcus.

55.

Over the next couple of weeks, Plaintiffs received additional form election and file transfer letters from other clients.

56.

In addition, Plaintiffs received letters from co-counsel in several cases purporting to unilaterally terminate their co-counsel agreements with Plaintiffs.  While still employed by the Firm, Defendants had reached agreements with these co-counsel to transfer the cases to BM.

57.

Upon information and belief, co-counsel in those cases entered into similar agreements with Bracker, Marcus, and BM.

**Bracker and Marcus Divert and Slow Roll Cases While Still Employed**

58.

In late 2014, prior to Defendants' resignations, the Firm received a case referral, which it intended to take along with the referring co-counsel.

59.

Rather than follow standard Firm protocol and draft an engagement agreement on Firm letterhead (which co-counsel expected), Bracker secretly directed co-counsel (an acquaintance of Bracker's):  "Let's put it on your letterhead" and stated she would explain later "in person."

60.

After resigning from the Firm, BM entered into a joint-representation agreement with co-counsel in that case, thus depriving the Firm of the opportunity that had come to the Firm prior to Bracker's resignation.

61.

Bracker directly communicated her intent to leave the Firm with clients, potential clients, and Firm referral sources, without including or notifying Bothwell.

62.

On or shortly before the date of her resignation, Bracker forwarded those communications from her Firm email account to her personal email account.  She then deleted the communications from her Firm account.

63.

Bracker and Marcus also deliberately delayed potential clients and co-counsel from engaging the Firm, falsely claiming that they were too busy to take their cases until January 2015 (even though Marcus had taken a "floating vacation" spanning nearly the entire month of November 2014), only to enter into representation agreements with those clients and co-counsel as soon as BM was formed.

64.

In an email exchange with a referring attorney, James M. Johnson, prior to Bracker's resignation, Bracker and Johnson discussed cases that they had – without Bothwell's knowledge – placed "on hold till January."

65.

Defendants were willing to delay – and potentially prejudice – cases of already-engaged clients of the Firm.

66.

On several occasions in the final months of 2014, Bracker and Marcus ignored directives to work on Firm client cases—ostensibly to postpone the work until it could be billed by their new firm.

67.

Near the end of 2014, the Firm had accepted a referral for a new False Claims Act case to be filed in the Middle District of Georgia.  In or around late November or early December 2014, Bothwell instructed Marcus to file the new case, but Marcus did not file the case before he resigned from the Firm.

68.

Without including or notifying Bothwell, Marcus contacted the referring attorney and touted Bracker's – and only Bracker's – supposed experience in handling such cases.

69.

In an attempt to delay the matter, Marcus manufactured concerns about filing the case immediately and, without Bothwell's knowledge, suggested to the referring attorney that they wait "until January" to file the case.

70.

In early December, Bothwell sought an assurance from Marcus that the case would be filed by the end of the year.

71.

Marcus assured Bothwell that upon receipt of a certificate of good standing from co-counsel – which he claimed co-counsel should have already mailed – and a check from the Firm, the case "should be ready to file."

72.

Instead of filing, however, Marcus stalled, prompting Bothwell to instruct one of the Firm's paralegals to do whatever it took to get the case ready to file and to provide Marcus with the documents and a check necessary to get the case filed.

73.

On a day that the Firm offices were closed for the holidays in late December 2014, Bothwell found Marcus at the Firm and inquired about the still-unfiled case.

74.

Marcus claimed to Bothwell that he had come in to the office because he was unable to log on to his 401K account from his home computer and needed to transfer his 401K investments in the Firm account.

75.

Marcus' cover story was false, however, as he had never even opened a 401K account and could not have been moving his money around.

76.

Bothwell reminded Marcus that the documents and check were ready for the new False Claims Act case to be filed.

77.

Marcus admitted that he had everything he needed to complete the filing, but falsely claimed that the Middle District of Georgia was closed for the last few business days of the year and that he would have to file the case on January 5, 2015 – a date by which he knew Bracker and he would have already resigned.

78.

Bothwell expressed concern about the delay, reminding Marcus that the attorney who had referred the matter to the Firm had wanted the case filed some time ago.  Bothwell instructed Marcus to reach out to the referring attorney to explain the delay.

79.

Instead of following Bothwell's directive, Marcus solicited the referring attorney to transfer the matter to BM while he was still employed by the Firm.

80.

BM filed the case under its own signature after Bracker & Marcus resigned from the Firm, thus diverting an important firm asset to BM.

**Defendants Copy and Delete Key Firm Documents**

81.

Defendants stole, copied, and deleted files belonging to the Firm, both before and after their resignations.

82.

Bracker's husband works as the Executive Director for Internet Security at Cox Enterprises and her brother is the Litigation IT Support Director for the law firm Seyfarth Shaw. Their circle of friends includes a variety of Internet security and computer experts, including at least one high-level government security employee.

83.

Between approximately December 1, 2014 and January 5, 2015, Bracker and Marcus accessed and downloaded or otherwise transferred to themselves thousands of Plaintiffs' files from Firm computers and the Firm's network.

84.

Bracker and Marcus accessed, downloaded, or transferred those files to themselves without authorization.  Such acts served no business purpose for the Firm and were detrimental to the Firm.

85.

Marcus downloaded some of those files onto an encrypted "flash" (a/k/a "thumb," "jump," or "pen") drive with U3 software, which is designed to erase or hide evidence of its use,

leaving no audit trail behind – even in the computer registry.

86.

Even after their resignation date of January 4, 2015, Bracker and Marcus continued accessing, downloading, and transferring Plaintiffs' files from Firm computers and the Firm's network. Such acts served no business purpose for the Firm and were detrimental to the Firm.

87.

Bracker falsely represented in her resignation letter that neither she nor a web designer friend of hers, Sunil Karve, had retained the Firm's passwords necessary to access, redesign, and maintain its website.

88.

Bracker and/or Karve continued accessing and making changes to the Firm's website after the effective date of her resignation.

89.

Bracker's and/or Karve's access and changes to the Firm's website were without authorization, and were unknown to Plaintiff when they occurred.

90.

Between approximately December 1, 2014 and January 4, 2015, Bracker and Marcus uploaded thousands of Plaintiffs' documents from Firm computers and the Firm's network to cloud-based file hosting services.

91.

Bracker and Marcus uploaded those documents without Plaintiffs' knowledge or authorization, and such acts served no business purpose for the Firm. Instead, the uploads were intended to benefit BM by allowing that new firm to be fully operational on day one.

17

92.

Between approximately December 1, 2014 and January 4, 2015, Bracker and Marcus scanned, forwarded, or otherwise sent Firm forms and documents to Bracker's personal email address without Plaintiffs' knowledge or authorization.  Such acts served no business purpose for the Firm.

93.

Between approximately December 1, 2014 and January 5, 2015, Bracker, Marcus, and Lang performed mass deletions of files from Firm computers, including deletions of thousands of emails.

94.

Bracker, Marcus, and Lang performed those deletions without Plaintiffs' knowledge or authorization.  Such acts served no business purpose for the Firm.

95.

Lang performed a mass deletion of files from her Firm computer during the time she was in the office on her last day – January 5, 2015.

96.

Lang performed the deletions before Bothwell had notified her of Bracker's and Marcus' departures.

97.

Lang performed the deletions without Plaintiffs' knowledge or authorization.  Such acts served no business purpose for the Firm.

98.

In a departure from his normal practice, Marcus erased and scrubbed his Firm computer's

18

Internet browsing history without authorization prior to his departure.

99.

Shortly before his departure, Marcus performed a "system restore" on his Firm computer.

100.

The system restore erased evidence of Marcus' recent activities.

101.

Marcus "restored" his Firm computer's system without Plaintiffs' knowledge or authorization.  Such act served no business purpose for the Firm.

102.

Within a month or so of his departure, contrary to firm protocol, and without permission, Marcus installed a program on his Firm computer that had the function of "shredding" files on the computer—which "shredding" is claimed to be unrecoverable.  Such act served no business purpose for the Firm.

103.

Marcus deleted all of the data on his Firm computer from the Firm's internal chat program, FON.

104.

Marcus deleted the FON data without Plaintiffs' knowledge or authorization.  Such act served no business purpose for the Firm.

105.

Marcus also changed the password to his Firm computer for the first time since being employed.

106.

Marcus did not provide the new password to his Firm computer to Plaintiffs, as was a job requirement.

107.

Marcus changed the password to his Firm computer without Plaintiffs' knowledge or authorization.  Such act served no business purpose for the Firm.

108.

In or around early January 2015, a potential referral source called the Firm and left Bothwell a voicemail.  When Bothwell tried to find the source's contact information, he discovered that Bracker had deleted the information, along with other contact information for referral sources and potential clients.

109.

Some or all Defendants downloaded case documents, emails, and billing information, without Plaintiffs' knowledge or authorization.

110.

To date, Defendants have refused to identify which files they took from the Firm.

111.

Additionally, after certain clients decided to remain with the Firm and requested that Defendants return their case files, Defendants failed to produce all of the files and emails in their possession, despite representing that the file transfers were complete.

112.

Between approximately December 1, 2014 and January 4, 2015, Marcus downloaded approximately ten thousand eBooks onto his Firm computer and then deleted them prior to his departure.

113.

The eBooks were unrelated to the practice of law.

114.

Marcus downloaded the eBooks in order to overwrite data, including evidence of deleted files. Simply "deleting" a file does not erase a file from forensic recovery, as the deletion merely means that the file becomes part of a computer's unallocated or "slack" space. However, by downloading massive amounts of allocated data – such as ten thousand eBooks – a computer's slack/unallocated space is overwritten, and any deleted files then become essentially impossible to recover.

115.

Marcus downloaded the eBooks without Plaintiffs' knowledge or authorization. Such act served no business purpose for the Firm.

116.

Even after the date of their resignations, Bracker and Marcus continued to access firm computers through the Internet until they were denied access by the Firm.

117.

Such acts served no business purpose for the Firm.

**Defendants Mislead, and Defame**

118.

By January 4, 2015, Bracker, while still employed by the Firm, Marcus, and BM had captured nearly the entire practice of the Firm, a practice that Bothwell had spent nearly 20 years building.

119.

Before their resignations, Bracker and Marcus surreptitiously contacted all of the Firm's clients and potential clients in a concerted effort to convince them to abandon or not engage the Firm.

120.

Bracker and Marcus pressured the clients to choose BM to represent them and to sign file transfer letters.

121.

On December 31, 2014, Bracker emailed two clients and asked:  "Got time for a call today with me?" and then deleted those emails from the Firm's computers.  Those clients "elected" Bracker as their counsel the next day.

122.

On January 1, 2015, Bracker emailed another client and asked:  "Do you have 5-10 minutes to talk with me?" The client "elected" Bracker two days later.  Bracker deleted that email from the Firm's computers.

123.

Marcus continued to contact one client who had decided to remain with Bothwell, even after she requested that Marcus stop harassing her, forcing the client to block Marcus' number.

124.

In the course of their pre-resignation communications with Firm clients, Bracker and Marcus made a number of false and misleading statements.

125.

Many of Bracker's and Marcus' communications with clients – including telephone calls on New Year's Eve 2014 – were marked by inexplicable urgency, aggressive pressure tactics, disparaging statements regarding Plaintiffs, false promises to take care of clients' payment obligations to Plaintiffs, and requests that clients keep their communications secret.

126.

Bracker and Marcus often misled clients into thinking that BM was a successor firm or that the Firm was in the process of dissolving and that Bracker or Marcus were just continuing the representation post-dissolution in their own firm.

127.

Bracker and Marcus told clients that they would not owe the Firm any fees if they terminated their relationships with Plaintiffs, even though Bothwell and the Firm had worked on their cases for up to eight years, and in spite of the fact that the clients' engagement agreements with Plaintiffs contained specific provisions outlining the clients' fee responsibilities to the Firm in the event of termination.  These statements were also contrary to Georgia law.

128.

Bracker and Marcus misled clients who sought assurances regarding their payment responsibilities to Plaintiffs by claiming that they (Bracker and Marcus) would simply take care of those responsibilities.

129.

Instead, after inducing the clients to terminate their representation by Plaintiffs, Bracker and Marcus ultimately presented the clients with engagement agreements that made the clients solely responsible for fees due Plaintiffs, while taking the full contingency fee amounts for BM – even for cases that had already been settled by the Firm or were near settlement as a result of the Firm's prior efforts.

130.

Seeking to hide how they had departed the Firm and lured clients away, Bracker and Marcus misled some former Firm clients by telling them that it would be a violation of the False Claims Act seal in their cases for them to have further contact with Bothwell.

131.

Bracker and Marcus then falsely represented to Plaintiffs that the clients had requested that the Plaintiffs not contact them and claimed that it would be a violation of the Georgia Bar Rules of Professional Conduct for the Firm to contact any of its former clients.  At that time, Plaintiffs had only had contact with five Firm clients – all of whom stayed with or came back to the Firm.

132.

When asked to explain why the Firm had allegedly split up, Bracker falsely claimed that she felt "battered" by Bothwell and likened him to an abusive spouse.

133.

Bracker and Marcus falsely claimed that Bothwell would drag out the clients' cases just to run up attorneys' fees.

134.

Bracker and Marcus falsely claimed that they had a better relationship with the federal government than Bothwell and could influence government attorneys with whom Bracker claimed to be good friends, and that they preferred working with her and Marcus instead of Bothwell.

135.

Bracker and Marcus falsely claimed that the federal government refused to deal with Bothwell, and would probably not settle the clients' cases if they stayed with the Firm.

136.

Bracker and Marcus falsely claimed that Bothwell would prevent settlement of and diminish or destroy the potential value of the clients' cases.

137.

Bracker and Marcus falsely claimed that if some clients did not forego Bothwell's representation, the federal government would undo any settlement to spite him and/or that Bothwell would cause any settlement payment to be thoroughly delayed.

138.

Bracker and Marcus falsely claimed that Bothwell's counsel was sending threatening and defamatory letters and instructed clients not to contact Bothwell's counsel.

139.

Bracker provided a copy of a brief that BM filed in a pending False Claims Act case to her friend, Maryland attorney Jamie Bennett ("Bennett"), who had given the Firm notice of her unilateral termination of her co-counsel agreement with the Firm in connection with Bracker's and Marcus' resignations.

140.

Bennett sent the brief to over 500 lawyers on the listserv for Taxpayers Against Fraud ("TAF"), the national organization of attorneys who represent relators in qui tam litigation and an important referral source for the Firm.

141.

The brief contained numerous false, disparaging, and defamatory statements about Bothwell, including that his fee agreement was unethical and unenforceable, despite the fact that Defendants were using essentially the very same fee agreement for their own firm.

142.

Bracker and Marcus falsely claimed to Plaintiffs, as well as to government and defense counsel, that they in fact represented clients, despite those clients' having yet to enter into engagement agreements with BM. Some of those clients never entered into agreements with Defendants at all and returned to the Firm.

143.

Bracker and Marcus informed some clients that they were in contact with defense counsel in the clients' cases and were settling cases on the clients' behalf, again despite not having entered into formal engagement agreements with the clients and despite being informed by clients that they were not moving forward with BM until BM agreed to take care of the clients' obligations to the Firm.

144.

Bracker and Marcus contacted government attorneys and instructed them to deal with BM and not Plaintiffs, despite not having entered into formal engagement agreements with the clients they purported to represent.

145.

Through their attorney, Bracker and Marcus misrepresented to Plaintiffs that some of the clients had formally engaged BM and forbade Plaintiffs from contacting the clients, knowing that those clients had refused to move forward without certain commitments from BM that were never made.

## COUNT ONE
## FRAUDULENT MISREPRESENTATION AND CONCEALMENT
### (Defendants Bracker, Marcus, and Lang)

146.

The preceding paragraphs are incorporated herein as if fully restated.

147.

Bracker and Marcus made false representations with the intent to deceive and to induce the Firm and Bothwell to pay them large bonuses to underwrite their new firm.  Lang assented to receiving a bonus for staying with the Firm while knowing that she had no intention of staying with the Firm.

148.

Bothwell and the Firm reasonably relied on these misrepresentations as being true.

149.

These misrepresentations were material to Bothwell's agreement to pay bonuses to Bracker and Marcus in advance of their executing a partnership agreement and related documents and for Lang to receive a bonus at all.

150.

Bracker, Marcus, and Lang failed to reveal information material to the Firm in order to induce Bothwell and the Firm to pay them bonuses they would not have received if they had not

deceived and misled the Firm and Bothwell by their knowing concealment.

151.

Defendants Bracker, Marcus and Long owed Plaintiffs a duty not to conceal material information from Plaintiffs.

152.

Bothwell and the Firm would not have paid the bonuses if Bracker, Marcus, or Lang had told the truth about their intentions.

153.

The Defendants' fraudulent misrepresentations and concealments have caused the Firm to suffer damages in an amount to be proven at trial.

154.

Bracker ,Marcus and Lang have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense.   Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

155.

In making the material misrepresentations and omissions to Plaintiffs, Bracker, Marcus and Lang showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

**COUNT TWO**
**BREACH OF FIDUCIARY DUTY**
**(Defendants Bracker and Marcus)**

156.

The preceding paragraphs are incorporated herein as if fully restated.

157.

Bracker and Marcus each owed Plaintiffs a fiduciary duty and a duty of good faith, fidelity, and loyalty.

158.

By their wrongful acts and omissions, including but not limited to those acts and omissions described herein, Bracker and Marcus tortiously and wrongfully breached their duties to Plaintiffs.

159.

As a direct and proximate result of Bracker's and Marcus' breaches, Plaintiffs have suffered damages in an amount to be proven at trial.

160.

Bracker and Marcus have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense.  Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

161.

Bracker's and Marcus' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

**COUNT THREE**
**CONVERSION**
**(All Defendants)**

162.

The preceding paragraphs are incorporated herein as if fully restated.

163.

Defendants – without authorization – appropriated, and assumed and exercised dominion over, the personal property of Plaintiffs, in hostility to and inconsistent with Plaintiffs' rights.

164.

Defendants converted and are in possession of property belonging to Plaintiffs, including, but not limited to, valuable computer data, forms, client files, and other documents.

165.

Upon information and belief, Defendants converted Plaintiffs' property for their own use. Specifically, Defendants used Plaintiffs' property to establish a competing law firm, complete with a roster of clients stolen from Plaintiffs.

166.

Plaintiffs demanded the return of their property, which Defendants have refused to do.

167.

Accordingly, Defendants are liable to Plaintiffs for the tort of conversion.

168.

As a direct and proximate result of Defendants' actions, Plaintiffs have suffered financial injury in an amount to be proven at trial.

169.

Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense.   Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

170.

Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

**COUNT FOUR**
**MISAPPROPRIATION OF CORPORATE OPPORTUNITY**
**(Defendants Bracker and Marcus)**

171.

The preceding paragraphs are incorporated herein as if fully restated.

172.

Bracker and Marcus each owed Plaintiffs a fiduciary duty not to appropriate business opportunities of the Firm.

173.

Bracker and Marcus tortiously and wrongfully breached their duties to Plaintiffs by diverting clients and potential clients – all of whom represented bona fide business opportunities of the Firm – to their own competing firm.

174.

As a direct and proximate result of Bracker's and Marcus' breaches, Plaintiffs have suffered damages in an amount to be proven at trial.

175.

Bracker and Marcus have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense.  Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

176.

Bracker's and Marcus' actions were committed with a specific intent to cause harm to Plaintiffs and show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Defendants Bracker, Marcus, and BM)

177.

The preceding paragraphs are incorporated herein as if fully restated.

178.

Plaintiffs had valid contractual relationships with clients taken by Defendants Bracker, Marcus and BM.

179.

Defendants Bracker, Marcus and BM, who are not parties to those contracts, induced those clients to sever their contracts and not continue their business relationships with Plaintiffs.

180.

In doing so, Defendants Bracker, Marcus and BM acted improperly and without privilege, and purposely and maliciously with the intent to injure.

181.

As a direct and proximate result of those Defendants' actions, Plaintiffs have suffered financial injury in an amount to be proven at trial.

182.

In addition, Defendants Bracker, Marcus and BM have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense.   Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

183.

Those Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

**COUNT SIX**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**(All Defendants)**

184.

The preceding paragraphs are incorporated herein as if fully restated.

185.

Plaintiffs had the expectancy of business relationships with clients taken by Defendants.

186.

Defendants knew about Plaintiffs' current and prospective business relationships, and intentionally and unjustifiably interfered with them by disrupting those relationships and inducing clients to not enter into or continue their business relationships with Plaintiffs.

187.

Defendants acted improperly and without privilege, and purposely and maliciously with the intent to injure.

188.

As a direct and proximate result of Defendants' interference, Plaintiffs have suffered and will continue to suffer financial injury; Plaintiffs will be directly deprived of any future revenues deriving from each opportunity, which will instead accrue to Defendants, as well as the additional benefits and credibility that would have accrued to it as a result of concluding and successfully completing those opportunities.

189.

In addition, Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense.   Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

190.  .

The Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

**COUNT SEVEN**
**DEFAMATION/SLANDER**
**(Defendants Bracker and Marcus)**

191.

The preceding paragraphs are incorporated herein as if fully restated.

192.

Defendants Bracker and Marcus made numerous oral statements about Plaintiffs to other individuals that were false, defamatory, and malicious in nature.

193.

Those false, defamatory, and malicious statements included, among others, allegations that Plaintiffs would delay and destroy clients' cases and that the federal government and its attorneys disliked and would refuse to deal or settle clients' cases with Plaintiffs.

194.

Those statements are of the kind tending to injure the reputation of Plaintiffs and expose the Plaintiffs to public hatred, contempt, or ridicule. In addition, the statements were made as to Plaintiffs in reference to their trade, office and profession, and were calculated to injure.

195.

Defendants Bracker and Marcus published the above-described unprivileged communications, which included defamatory statements about Plaintiffs, to other individuals.

196.

Defendants Bracker and Marcus published those statements with a specific intent to benefit themselves and harm Plaintiffs.

197.

As a result of Defendants Bracker's and Marcus' statements, Plaintiffs have suffered actual injury and special harm in the form of damage to their reputation, actual loss and potential further loss of business, and other injuries.

198.

Bracker and Marcus have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense.  Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

199.

Defendants Bracker's and Marcus' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

**COUNT EIGHT**
**DEFAMATION/LIBEL**
**(Defendants Bracker and Marcus)**

200.

The preceding paragraphs are incorporated herein as if fully restated.

201.

Defendants Bracker and Marcus made numerous false, defamatory, and malicious statements about Plaintiffs.

202.

Those false, defamatory, and malicious statements were expressed in writing.

203.

Those statements are of the kind tending to injure the reputation of Plaintiffs and expose the Plaintiffs to public hatred, contempt, or ridicule.

204.

Defendant Bracker republished certain of the above-referenced defamatory statements to a third-party, Jamie Bennett.

205.

Bennett posted the defamatory material on the TAF listserv.

206.

As a result of those Defendants' statements, Plaintiffs have suffered actual injury and special harm in the form of damage to their reputation, actual loss and potential further loss of business, and other injuries.

207.

Those Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense.  Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

208.

Defendant Bracker's actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

## COUNT NINE
## VIOLATIONS OF THE GEORGIA COMPUTER SYSTEMS PROTECTION ACT
### (All Defendants)

209.

The preceding paragraphs are incorporated herein as if fully restated.

210.

Defendants have committed the crime of computer theft by using Plaintiffs' computers and computer network with knowledge that such use was without authority and with the intention of taking or appropriating Plaintiffs' property, whether or not with the intention of depriving Plaintiffs of possession; obtaining property by deceitful means or artful practice;

and/or converting property to their use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property.

211.

Defendants have committed the crime of computer trespass by using Plaintiffs' computers and computer network with knowledge that such use was without authority and with the intention of deleting or removing, either temporarily or permanently, computer programs or data from a computer or computer network; obstructing, interrupting, or interfering with the use of a computer program or data; and/or altering, damaging, or causing the malfunction of a computer, computer network, or computer program, regardless of how long the alteration, damage, or malfunction persists.

212.

As victims of Defendants' above-described crimes, and as a direct and proximate result of those crimes, Plaintiffs have suffered damages and injuries and are entitled to civil remedies pursuant to O.C.G.A. § 16-9-93(g).

213.

Defendants are individually and jointly liable to Plaintiffs for damages under O.C.G.A. § 16-9-93, which include, without limitation, loss of profits and victim expenditure, as well costs of suit.

## COUNT TEN
## VIOLATIONS OF THE FEDERAL COMPUTER FRAUD AND ABUSE ACT
### (All Defendants)

214.

The preceding paragraphs are incorporated herein as if fully restated.

215.

The personal computers, server computers, and other devices described in this Complaint were all "protected computers" within the meaning of the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*. (the "CFAA").

216.

Defendants violated CFAA §§ 1030(a)(5)(B) and (C) by intentionally and without authorization accessing Plaintiffs' protected computers as described above, and causing damage and loss to Plaintiffs or recklessly causing damage to Plaintiffs.  Defendants also violated CFAA § 1030(a)(4), by knowingly and with the intent to defraud exceeding their authorized computer access and by so doing furthered their intended fraud and obtained items of value.

217.

Defendants violated CFAA § 1030(a)(2)(C), either directly themselves or by directing others to do so, by intentionally accessing protected computers assigned them by Plaintiffs and/or protected computers used by Plaintiffs for storage of their data, information, and databases, without authorization or exceeding authorized access, and thereby obtained information from such protected computers.

218.

Defendants violated CFAA § 1030(a)(4) by, either directly themselves or by directing others to do so, knowingly and with intent to defraud the Firm, accessing the Firm's protected computers without authorization, or by exceeding their authorized access.

219.

The value of such unauthorized use to Defendants was more than $5,000.00.

220.

Marcus violated CFAA § 1030(a)(5)(A) by intentionally and knowingly transmitting a program, information, code, or command to wipe his Firm computer – a protected computer – thereby causing damage to and destruction of the data thereon without the Firms' authorization,.

221.

Defendants committed the above-described violations knowingly and intentionally in coordination with each other, by agreement with each other, and within the course and scope of their unlawful conspiracy among themselves, for the express purposes of destroying information belonging to Plaintiffs or depriving Plaintiffs of access to its business records and data, and of destroying evidence of their conspiracy and wrongdoing.  Accordingly, Defendants are liable as co-conspirators under CFAA § 1030(a)(6).

222.

As a direct and proximate result of Defendants' CFAA violations, Plaintiffs have suffered damages and loss and are entitled to civil remedies pursuant to CFAA § 1030(g), including compensatory damages, injunctive relief, or other equitable relief.

**COUNT ELEVEN**
**UNJUST ENRICHMENT**
**(Defendants BM, Bracker and Marcus)**

223.

The preceding paragraphs are incorporated herein as if fully restated.

224.

As alleged herein, by virtue of its employees' plunder of the Firm, BM and its employees have received the benefits of the Plaintiffs' substantial work and investment, including but not limited to the majority of Plaintiffs' pending cases – many of which have reached or are nearing

lucrative settlement agreements in their respective cases – as well as vast amounts of valuable Firm data and documents which it can use – and is using – to facilitate its own competing practice.

225.

BM, Bracker and Marcus have failed and refused to return, compensate, or reimburse Plaintiffs for the referenced benefits.

226.

As a direct and proximate result, BM received the referenced benefits at the expense of Plaintiffs and, thus, has been and continues to be unjustly enriched.

227.

Consequently, as a direct and proximate result of BM, Bracker and Marcus' receipt and retention of the referenced benefits, Plaintiffs are entitled to restitution, which justice and equity require, in an amount to be proven at trial.

228.

Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense. Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

229.

Defendant Bracker's actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

## COUNT TWELVE
## VIOLATION OF GEORGIA RACKETEER INFLUENCED
## AND CORRUPT ENTERPRISES ACT
### (All Defendants)

230.

The preceding paragraphs are incorporated herein as if fully restated.

231.

At all relevant times, Defendants through a pattern of racketeering activity, attempted to acquire and maintain, directly and indirectly, an interest in personal property owned by Plaintiffs, including money.  Such illegal activity is prohibited under O.C.G.A. § 16-14-4(a) – (c), and in this case, included violations of O.C.G.A. § 16-8-1, *et seq.* relating to theft; O.C.G.A. § 16-9-90, *et seq.*, known as the "Georgia Computer Systems Protection Act"; wire fraud under 18 U.S.C. § 1343; and mail fraud under 18 U.S.C. § 1841.

232.

The members of the enterprise committed at least two predicate acts under Georgia law, including, but not limited to

- unlawfully taking and appropriating Plaintiffs' property, including valuable computer data, forms, client files, and other documents, with the intention of depriving Plaintiffs of the property, contrary to the laws of the State of Georgia, and the good order, peace, and dignity thereof;

- obtaining Plaintiffs' property, including money, by deceitful means or artful practice with the intention of depriving Plaintiffs of the property, by intentionally creating or confirming Plaintiffs' impression that members of the enterprise were in dire need of, and would use, bonus payments from Plaintiffs to address financial crises, which was false and which members of the enterprise knew or believed to be false, thereby inducing Plaintiffs to provide those bonus payments, which members of the enterprise instead used to finance their competing business, contrary to the laws of the State of Georgia, and the good order, peace, and dignity thereof;

- using Plaintiffs' computers and computer network with knowledge that such use was without authority to (a) intentionally take or appropriate Plaintiffs' property,

including valuable computer data, forms, client files, and other documents and converting that property to their own use; and (b) deleting or removing computer programs and data from Plaintiffs' computers and computer network, including emails and internal communication records, as well as obstructing, interrupting, and interfering with the use of a computer program or data by, among other things, altering passwords, thus preventing Plaintiffs from accessing their own computers;

• committed wire fraud and mail fraud by making communications using the United States wires and mails in an attempt to facilitate and perpetrate Defendants' scheme to defraud and deprive Plaintiffs of the full rights to Plaintiff's property and to prevent Plaintiffs from further representing Firm clients

233.

The Defendants' acts described above constitute violations of the Georgia Racketeer Influenced and Corrupt Enterprises Act, O.C.G.A. § 16-14-1 *et seq*. ("Georgia RICO").

234.

The acts of racketeering activity committed by Defendants have the same or similar intents, in that they sought to deprive Plaintiffs of the full use and value of their property, and to provide financial gain to Defendants.

235.

The acts of racketeering activity committed by Defendants have the same or similar results, in that they did all result in Defendants exerting control and possession over Plaintiffs' property, as well as illegally fleecing the Firm of long-term clients with valuable causes of action.

236.

The acts of racketeering activity committed by Defendants have the same or similar accomplices, in that they involved Defendant Bracker and Defendant Marcus, as well as Lang, for their individual benefit and for the benefit of BM.

237.

The acts of racketeering activity committed by Defendants have the same or similar victims, specifically Plaintiffs.

238.

The acts of racketeering activity committed by Defendants have the same or similar methods of commission in that they involved mail fraud, wire fraud, theft, and illegal computer access and were committed in furtherance of a scheme to defraud Plaintiffs of their interests in property.

239.

The acts of racketeering activity committed by Defendants are interrelated by distinguishing characteristics and are not isolated incidents, in that the acts involved the same or similar misrepresentations, the same or similar modes of commission, the same or similar financial benefits to Defendants, and the same or similar efforts to conceal the misconduct.

240.

As a direct and proximate result of Defendants' Georgia RICO violations, Plaintiffs have suffered injury.

241.

Plaintiffs are entitled to three times the actual damages sustained and to recover their attorneys' fees and costs of investigation and litigation reasonably incurred under O.C.G.A. § 16-14-6(c).

242.

Plaintiffs are entitled to additional relief in the form of an order divesting each Defendant of any interest in the enterprise or any interest in any entity constituting a member thereof,

including all real and personal property (including money) derived from the enterprise under O.C.G.A. § 16-14-6(a).

243.

Because Defendants' actions in violation of the Georgia RICO statute show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, Plaintiffs are also entitled to an award of punitive damages.

**COUNT THIRTEEN**
**CIVIL CONSPIRACY / AIDING AND ABETTING**
**(All Defendants)**

244.

The preceding paragraphs are incorporated herein as if fully restated.

245.

Through unlawful means, Defendants acted in concert to damage Plaintiffs.

246.

Acting together, Defendants engaged in the tortious conduct described in the foregoing Counts and alleged herein in order to damage Plaintiffs.

247.

Each Defendant aided and abetted the unlawful acts of the other Defendants, including breaches of duties owed the Firm.

248.

As a direct result of Defendants' conspiracy and aiding and abetting, Plaintiffs have suffered damages in an amount to be proven at trial.

249.

Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense.  Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recovery of their litigation expenses, including but not limited to their reasonable attorneys' fees.

250.

Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages.

**WHEREFORE**, having set forth their complaint, Plaintiffs pray that this Court:

(a)     Cause summons and process to issue as required by law;

(b)     Empanel a jury to try all questions of fact;

(c)     Award Plaintiffs their damages as proven at trial;

(d)     Award Plaintiffs punitive damages, exemplary damages, and any enhanced damages allowed by law or authorized by statute, rule, or regulation arising out of Defendants' misconduct, statutory violations, torts, and breaches;

(e)     Order that the Defendants be divested of any interest in property rightfully owned or possessed by Plaintiffs;

(f)     Award Plaintiffs attorneys' fees and costs for Defendants' bad faith, stubborn litigiousness and causation of unnecessary trouble and expense pursuant to O.C.G.A. § 13-6-11;

(g)     Cast all costs against Defendants; and

(h)     Award such further and other relief as this Court deems just and proper.

Respectfully submitted this 25th day of June, 2015.

/s/ Darren Summerville
Darren Summerville
Georgia Bar No. 691978
darren@summervillefirm.com
Angela Fox
Georgia Bar No. 131077
angie@summervillefirm.com

**THE SUMMERVILLE FIRM, LLC**
400 Colony Square, Suite 2000
1201 Peachtree Street, NE
Atlanta, GA 30361
T: 770.635.0030
F: 770.635.0029

/s/ Kristofer R. Schleicher
Kristofer R. Schleicher
Georgia Bar No. 629327
kschleicher@gsrdlaw.com
Parsa Fattahi
Georgia Bar No. 154232
pfattahi@gsrdlaw.com

**GIACOMA SCHLEICHER ROBERTS & DAUGHDRILL, LLC**
Resurgens Plaza, Suite 2750
945 East Paces Ferry Road
Atlanta, Georgia 30326
Telephone:  (404) 924-2850
Facsimile:  (404) 924-2861

*Attorneys for Mike Bothwell and
The Bothwell Law Group, P.C.*

**EXHIBIT A**

**RESIGNATION LETTER OF JULIE BRACKER**

January 4, 2015

Mike Bothwell
Bothwell Bracker P.C.
304 Macy Drive
Roswell, GA 30076

Dear Mike:

This letter serves as formal notice that I am resigning my employment with your firm as of today's date. My current contact information, which (as you know) must be provided to anyone who calls for me, is provided below. I will update it when I have a new business address.

I want to take this opportunity to address a few matters relating to the removal of my name from your business.

First, as to the website, I have already removed my page, but removing my name throughout the site will require you to have the background redesigned with whatever branding you choose. I have enclosed in this envelope the necessary passwords to access, redesign, and maintain the site. Neither Sunil Karve nor I have retained a set of these passwords.

Second, having been in your employ for two previous name changes, I am well aware that it is not an instant process to remove my name from the front signage, business cards, the State Bar registry, your caller ID, etc. However, given that I am continuing to practice under my own name, I would appreciate it if these tasks can be completed by January 31st, 2015. Please start with the most public-facing things, to minimize confusion that may be caused by having my name linked with yours when we are no longer practicing together.

Finally, I have consulted the Georgia Rules of Professional Conduct as well as an attorney concerning the clients I represented while in your employ. As you likely know, Georgia law is clear that clients have an absolute right to decide to remain with your firm or accompany me to my new practice. As for the clients with whom we are associated through Jill Schwartz & Associates, I expect you will receive a letter from Ms. Schwartz. As to C███ S█████, he is engaged through Ashcraft & Gerel, and I likewise expect a letter from that firm shortly. I also attach election letters from clients that have chosen to come with me to my new firm. In addition to the attached, several clients have agreed to accompany me and are in the process of returning election letters. Specifically, T██ W██████ and T████ G████, R██ B███ and J█████ W█████, and T██ N██ have chosen to be represented by my new firm; I expect election letters from these individuals shortly and will forward them to your attention.

I will be in touch to arrange transfer of the client files, where appropriate.

Sincerely,

Julie Bracker

PHONE                           WEB

5583 Saxony Glen Drive, Marietta GA 30066        404 ███ 2454        JulieBracker@att.com

December 31, 2014



Dear ████ ██████:

This letter confirms our discussion, in which I informed you that (a) as of approximately January 5, 2015, I will no longer be practicing law with Mike Bothwell or Bothwell Bracker PC; and (b) under applicable law, you, as the client, have an absolute right to your choice of counsel.

Accordingly, you must elect whether you would like your case to be handled by Mike Bothwell or Julie Bracker going forward. Please check below to indicate your preference:

_____ I prefer that my case remain with Mike Bothwell's office after Julie Bracker's departure.

___X___ I prefer that my case be handled by Julie Bracker, and accordingly ask that the file be transferred to her at her new place of business as soon as practicable.

I want to thank you again for the opportunity to represent you to this point, and hope to continue to serve you in the future.

Best regards,

Julie Bracker

January 1, 2015



Dear R█████

      This letter confirms our discussion, in which we informed you that (a) as of approximately January 5, 2015, Jason Marcus and I will no longer be practicing law with Mike Bothwell or Bothwell Bracker PC; and (b) under applicable law, you, the client, have an absolute right to your choice of counsel.

      Accordingly, you must elect whether going forward, you would like your case to be handled by Mike Bothwell or by our new firm, Bracker & Marcus LLC.

      Please check below to indicate your preference:

           ____ I prefer that my case remain with Mike Bothwell.

           _X_ I prefer that my case be handled by Bracker & Marcus, and accordingly ask that the file be transferred to their new place of business as soon as practicable.

      I want to thank you again for the opportunity to represent you to this point, and hope to continue to serve you in the future.

      Best regards.

Julie Bracker

January 1, 2015



Dear S███████

  This letter confirms our discussion, in which I informed you that (a) as of approximately January 5, 2015, I will no longer be practicing law with Mike Bothwell or Bothwell Bracker PC; and (b) under applicable law, you, as the client, have an absolute right to your choice of counsel.

  Accordingly, you must elect whether you would like your case to be handled by Mike Bothwell or Julie Bracker going forward.  Please check below to indicate your preference:

    ____ I prefer that my case remain with Mike Bothwell's office after Julie Bracker's departure.

    ____ I prefer that my case be handled by Julie Bracker, and accordingly ask that the file be transferred to her at her new place of business as soon as practicable.

  I want to thank you again for the opportunity to represent you to this point, and hope to continue to serve you in the future.

    Best regards,

    Julie Bracker

January 1, 2015



Dear C▮▮▮▮

This letter confirms our discussion, in which I informed you that (a) as of approximately January 5, 2015, I will no longer be practicing law with Mike Bothwell or Bothwell Bracker PC; and (b) under applicable law, you, as the client, have an absolute right to your choice of counsel.

Accordingly, you must elect whether you would like your case to be handled by Mike Bothwell or Julie Bracker going forward.  Please check below to indicate your preference:

_____ I prefer that my case remain with Mike Bothwell's office after Julie Bracker's departure.

_X__ I prefer that my case be handled by Julie Bracker, and accordingly ask that the file be transferred to her at her new place of business as soon as practicable.

I want to thank you again for the opportunity to represent you to this point, and hope to continue to serve you in the future.

Best regards,

Julie Bracker

January 3, 2015



Dear M

   This letter confirms our discussion, in which I informed you that (a) as of approximately January 5, 2015, I will no longer be practicing law with Mike Bothwell or Bothwell Bracker PC; and (b) under applicable law, you, as the client, have an absolute right to your choice of counsel.

   Accordingly, you must elect whether you would like your case to be handled by Mike Bothwell or Julie Bracker going forward.  Please check below to indicate your preference:

     ____ I prefer that my case remain with Mike Bothwell's office after Julie Bracker's departure.

     ____ I prefer that my case be handled by Julie Bracker, and accordingly ask that the file be transferred to her at her new place of business as soon as practicable.

   I want to thank you again for the opportunity to represent you to this point, and hope to continue to serve you in the future.

     Best regards,

     Julie Bracker

**EXHIBIT B**

**RESIGNATION LETTER OF JASON MARCUS**

January 4, 2015

Mike:

I quit, effective immediately.

Please forward any mail, including court business, and documents related to my employment to 1715 Liberty Ln, Roswell, GA 30075.

Please provide the following phone number to anyone who emails me or calls for me: (678) ███████

Julie will provide you with updated contact information when a new office is established.

Sincerely,

Jason Marcus

January 1, 2015



Mike Bothwell
Bothwell Bracker PC
304 Macy Drive
Roswell, GA 30076

Dear Mr. Bothwell:

I understand that Julie Bracker and Jason Marcus will no longer be practicing law at Bothwell Bracker PC. This letter is to inform you that, going forward, I have elected to have my case handled by Ms. Bracker and Mr. Marcus.

Accordingly, I ask that all case files, physical and electronic, be transferred to Ms. Bracker at her new place of business as quickly as possible.  I understand that Ms. Bracker and/or Mr. Marcus will contact you with further information to effectuate that transfer.

I further request that within one week, you provide me with a final bill, showing all fees and expenses to date for your firm, with a copy to Bracker & Marcus.  The copy to me may be directed to the email address above. The copy to Bracker & Marcus should be addressed to julie.bracker@gmail.com.

Thank you for your time and efforts on my behalf.

Best regards,

1/2/2015

M███ S███

January 1, 2015



Dear M███████:

     This letter confirms our discussion, in which I informed you that (a) as of approximately January 5, 2015, I will no longer be practicing law with Mike Bothwell or Bothwell Bracker PC; and (b) under applicable law, you, the client, have an absolute right to your choice of counsel.

     Accordingly, you must elect whether going forward, you would like your case to be handled by Mike Bothwell or by my new firm, Bracker & Marcus LLC.

     Please check below to indicate your preference:

        ____ I prefer that my case remain with Mike Bothwell.

        ✓ I prefer that my case be handled by Bracker & Marcus, and accordingly ask that the file be transferred to their new place of business as soon as practicable.

     M███████ A██████ 1/2/2015

     I want to thank you again for the opportunity to represent you to this point, and hope to continue to serve you in the future.

     Best regards.

*Jason Marcus*

Jason Marcus